# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| H.D. YORSTON, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EPIX PHARMACEUTICALS, INC., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br>Defendants. | No. 1:05-cv-10166-PBS |
| ROBERT GREENE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EPIX PHARMACEUTICALS, INC., formerly known as EPIX Medical, Inc., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br>Defendants. | No. 1:05-cv-10194-WGY |

*[Captions Continue on Following Page]*

**DECLARATION OF NANCY FREEMAN GANS IN SUPPORT OF MOTION OF THE DISCIPLINED GROWTH INVESTORS GROUP FOR CONSOLIDATION OF RELATED ACTIONS, FOR APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

| | |
|---|---|
| JOHN C. JOHNSON JR., JOHN C. JOHNSON JR. TARGET BENEFIT PENSION, JEFFREY S. JOHNSON and JOHN C. JOHNSON JR. DEFINED BENEFIT PENSION PLAN, Individually and On Behalf of All Others Similarly Situated,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>EPIX PHARMACEUTICALS, INC., formerly known as EPIX Medical, Inc., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br><div align="center">Defendants.</div> | No. 1:05-cv-10272-GAO |
| DORAVILLE MANAGEMENT II CORP. by Donald Ramirez, President on Behalf of Himself and All Others Similarly Situated,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>EPIX PHARMACEUTICALS, INC., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br><div align="center">Defendants.</div> | 1:05-cv-10288-PBS |

*[Captions Continue on Following Page]*

| | |
|---|---|
| STANLEY A. KIM, On Behalf of Himself and Others Similarly Situated,<br><br>      Plaintiff,<br><br>   v.<br><br>EPIX PHARMACEUTICALS, INC., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br>      Defendants. | No. 1:05-cv-10315-PBS |
| YALE TOLWIN, on Behalf of Himself and All Persons Similarly Situated,<br><br>      Plaintiff,<br><br>   v.<br><br>EPIX PHARMACEUTICALS, INC., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br>      Defendants. | No. 1:05-cv-10388-PBS |

I, John C. Martland, hereby declare as follows:

1.  I am a member of the law firm Gilman and Pastor, LLP, counsel for Disciplined Growth Investors and Compass Investors A/C (the "Disciplined Growth Investors Group" or "Movants," herein).

2.  Movants seeks appointment as Lead Plaintiff pursuant to Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act") in the above-captioned actions (collectively, the "Action").

3.      I submit this Declaration, together with the attached exhibits, in support of the motion of the

Disciplined Growth Investors Group, *inter alia*, to appoint it to serve as Lead Plaintiff on

behalf of the class in the Action and to approve Movants' choice of Glancy Binkow &

Goldberg LLP as Lead Counsel, with Moulton & Gans, P.C. as Liaison Counsel.  I am fully

familiar with the facts set forth herein.

4.      Attached hereto as the exhibits indicated are true and correct copies of the following:

Exhibit A:        Press release published on January 27, 2005, on *Business Wire* announcing

pendency of the lawsuit commenced by H.D Yorston against defendants herein

Exhibit B:        Loss Charts for Disciplined Growth Investors, Inc. and Compass Investors

Limited Partnership.

Exhibit C:        Disciplined Growth Investor's standard "Investment Management Agreement"

Exhibit D:        Firm resumé of Glancy Binkow & Goldberg LLP.

Exhibit E:        Firm resumé of Moulton & Gans, P.C.

I declare under penalty of perjury under the laws of the State of Massachusetts that the

foregoing facts are true and correct.  Executed this 28th day of March, 2005, at Boston,

Massachusetts.

/s/ Nancy Freeman Gans
Nancy Freeman Gans


**CERTIFICATE OF SERVICE**

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served
upon the attorney of record for each party on March 28, 2005.

/s/ Nancy Freeman Gans
Nancy Freeman Gans

# EXHIBIT A - PRESS RELEASE



Yahoo!  My Yahoo!  Mail

Search the Web [          ]    **Search**

Finance Home  -  Help

**YAHOO!** FINANCE  **Sign In**  New User? Sign Up

Welcome [Sign In]    To track stocks & more, Register

**Financial News**

Enter symbol(s) [          ] [ Basic ▼ ] [ Get ] Symbol Lookup

**Press Release**    Source: Lerach Coughlin Stoia Geller Rudman & Robbins LLP

# Lerach Coughlin Stoia Geller Rudman & Robbins LLP Files Class Action Suit against EPIX Pharmaceuticals, Inc.

Thursday January 27, 4:40 pm ET

NEW YORK--(BUSINESS WIRE)--Jan. 27, 2005--Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") (http://www.lerachlaw.com/cases/epix/) today announced that a class action lawsuit has been commenced in the United States District Court for the District of Massachusetts on behalf of purchasers of EPIX Pharmaceuticals, Inc. ("EPIX") (NASDAQ:EPIX - News) securities during the period between July 10, 2003 and January 14, 2005 (the "Class Period").

If you wish to serve as lead plaintiff, you must move the Court no later than 60 days from today. If you wish to discuss this action or have any questions concerning this notice or your rights or interests, please contact plaintiff's counsel, Samuel H. Rudman or David A. Rosenfeld of Lerach Coughlin at 800/449-4900 or 619/231-1058 or via e-mail at wsl@lerachlaw.com. If you are a member of this class, you can view a copy of the complaint as filed or join this class action online at http://www.lerachlaw.com/cases/epix/. Any member of the purported class may move the Court to serve as lead plaintiff through counsel of their choice, or may choose to do nothing and remain an absent class member.

The complaint charges EPIX and certain of its officers and directors with violations of the Securities Exchange Act of 1934. EPIX (formerly known as EPIX Medical Inc.) is a developer of targeted contrast agents that are designed to improve the diagnostic quality of images produced by magnetic resonance imaging ("MRI"). MRI is an imaging technology for a range of applications, including the identification and diagnosis of a variety of medical disorders.

The complaint alleges that, by the start of the Class Period, defendants became aware of clinical quality issues with the underlying data for their MS-325 Phase III program. MS-325 is designed to provide visual imaging of the vascular system through a type of MRI known as magnetic resonance angiography. These issues, including the generation of unintelligible imaging scans, made difficult, if not impossible, the proper control of their clinical test results and statistical analysis of the data and results. On December 16, 2003, defendants announced the submission of their New Drug Application ("NDA") for MS-325. Defendants continued to conceal the serious problems with their clinical program, specifically the poor quality of the underlying clinical data and problems with the statistical analysis. Defendants instead made positive and encouraging remarks about their "extensive scientific and clinical development" activities and prospects for product approval.

Then, on January 14, 2005, as alleged in the Complaint, the Company reported shocking news about the MS-325 submission. Although defendants sought to place a positive spin on their receipt of an "approvable" action letter from the U.S. Food & Drug Administration ("FDA") for MS-325, the news was far from positive. The FDA had determined that problems with the Phase III clinical trials were so serious that it was impossible for them to come to a conclusion about the efficacy of MS-325. Worse, the FDA noted problems with the underlying data itself, problems that could not be resolved simply on the basis of re-analysis of the data. Thus, defendants delivered a serious setback to investors and, based on their news, the price of EPIX stock plunged 27%, to $10.67, for a loss of $3.98 per share, on volume of 11 million shares.

Plaintiff seeks to recover damages on behalf of all purchasers of EPIX securities during the Class Period (the "Class"). The plaintiff is represented by Lerach Coughlin, which has expertise in prosecuting investor class actions and extensive experience in actions involving financial fraud.

Lerach Coughlin, a 140-lawyer firm with offices in San Diego, San Francisco, Los Angeles, New York, Boca Raton, Washington, D.C., Houston, Philadelphia and Seattle, is active in major litigations pending in federal and state courts throughout the United States and has taken a leading role in many important actions on behalf of defrauded investors, consumers, and companies, as well as victims of human rights violations. Lerach Coughlin lawyers have been responsible for more than $20 billion in aggregate recoveries. The Lerach Coughlin Web site (http://www.lerachlaw.com) has more information about the firm.

Contact:

```
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
William Lerach, 800-449-4900
Samuel H. Rudman
David A. Rosenfeld
wsl@lerachlaw.com
```

Source: Lerach Coughlin Stoia Geller Rudman & Robbins LLP

# EXHIBIT B-LOSS CHARTS

# TABLE OF MOVANT COMPASS INVESTORS LIMITED PARTNERSHIP
## LOSSES IN EPIX

| NAME | BUY DATE | SHARES | PRICE | AMOUNT | |
|---|---|---|---|---|---|
| COMPASS INVESTORS LIMITED PARTNERSHIP | 10 05 2004 | 77900.0000 | 17.89546 | $ | 1,394,056.33 |
| TOTAL SHARES BOUGHT AND VALUE | | 77,900.0000 | | $ | 1,394,056.33 |
| SHARES HELD AND VALUE (NO SELL TRANSACTIONS) | 03 21 2005 | 77,900.0000 | 8.77040 | $ | 683,214.16 |
| MOVANTS' TOTAL LOSS | 03 21 2005 | | | $ | 710,842.17 |

For shares held at the end of the class period, damages are calculated by multiplying the shares held by the average share price during the 90 calendar days after the end of the Class Period. The price used is $8.7704 as of March 21, 2005.

# TABLE OF MOVANT DISCIPLINED GROWTH INVESTORS INC.'S LOSSES IN EPIX
## (EXCLUDING COMPASS INVESTORS LIMITED PARTNERSHIP)

| NAME | BUY DATE | SHARES | PRICE | AMOUNT |
|------|----------|--------|-------|--------|
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 300.0000 | 17.99330 | $ 5,397.99 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 600.0000 | 17.90370 | $ 10,742.22 |
| DISCIPLINED GROWTH INVESTORS | 11 15 2004 | 100.0000 | 17.07900 | $ 1,707.90 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 2800.0000 | 17.89720 | $ 50,112.16 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 4400.0000 | 17.89650 | $ 78,744.60 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 2200.0000 | 17.89770 | $ 39,374.94 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 2900.0000 | 17.89710 | $ 51,901.59 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 9600.0000 | 17.89590 | $ 171,800.64 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 600.0000 | 17.90370 | $ 10,742.22 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 600.0000 | 17.90370 | $ 10,742.22 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 200.0000 | 17.92040 | $ 3,584.08 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 4800.0000 | 17.89540 | $ 85,897.92 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 10300.0000 | 17.89540 | $ 184,322.62 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 28800.0000 | 17.89540 | $ 515,387.52 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 8800.0000 | 17.89540 | $ 157,479.52 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 3000.0000 | 17.89540 | $ 53,686.20 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 4800.0000 | 17.89540 | $ 85,897.92 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 600.0000 | 17.89540 | $ 10,737.24 |
| DISCIPLINED GROWTH INVESTORS | 12 09 2004 | 11600.0000 | 17.44260 | $ 202,334.16 |
| DISCIPLINED GROWTH INVESTORS | 12 16 2004 | 11500.0000 | 18.06040 | $ 207,694.60 |
| DISCIPLINED GROWTH INVESTORS | 09 14 2004 | 2000.0000 | 21.70000 | $ 43,400.00 |

TABLE OF MOVANT DISCIPLINED GROWTH INVESTORS, INC.'S LOSSES IN EPIX SECURITIES

| NAME | BUY DATE | SHARES | PRICE | AMOUNT |
|------|----------|--------|-------|--------|
| DISCIPLINED GROWTH INVESTORS | 09 22 2004 | 1000.0000 | 20.34900 | $ | 20,349.00 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 3900.0000 | 17.89540 | $ | 69,792.06 |
| DISCIPLINED GROWTH INVESTORS | 10 29 2004 | 200.0000 | 15.62900 | $ | 3,125.80 |
| DISCIPLINED GROWTH INVESTORS | 11 04 2004 | 200.0000 | 15.75900 | $ | 3,151.80 |
| DISCIPLINED GROWTH INVESTORS | 11 16 2004 | 250.0000 | 17.04920 | $ | 4,262.30 |
| DISCIPLINED GROWTH INVESTORS | 11 23 2004 | 100.0000 | 15.89900 | $ | 1,589.90 |
| DISCIPLINED GROWTH INVESTORS | 11 29 2004 | 100.0000 | 16.62930 | $ | 1,662.93 |
| DISCIPLINED GROWTH INVESTORS | 12 09 2004 | 100.0000 | 17.13000 | $ | 1,713.00 |
| DISCIPLINED GROWTH INVESTORS | 11 29 2004 | 175.0000 | 16.62930 | $ | 2,910.13 |
| DISCIPLINED GROWTH INVESTORS | 12 06 2004 | 200.0000 | 17.96400 | $ | 3,592.80 |
| DISCIPLINED GROWTH INVESTORS | 12 09 2004 | 300.0000 | 17.13000 | $ | 5,139.00 |
| DISCIPLINED GROWTH INVESTORS | 12 15 2004 | 400.0000 | 18.15720 | $ | 7,262.88 |
| DISCIPLINED GROWTH INVESTORS | 12 27 2004 | 400.0000 | 17.84000 | $ | 7,136.00 |
| DISCIPLINED GROWTH INVESTORS | 12 16 2004 | 300.0000 | 18.15710 | $ | 5,447.13 |
| DISCIPLINED GROWTH INVESTORS | 12 17 2004 | 200.0000 | 18.02900 | $ | 3,605.80 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 200.0000 | 17.08400 | $ | 3,416.80 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 100.0000 | 17.10450 | $ | 1,710.45 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 200.0000 | 17.16000 | $ | 3,432.00 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 200.0000 | 17.16000 | $ | 3,432.00 |
| DISCIPLINED GROWTH INVESTORS | 10 05 2004 | 2300.0000 | 17.02690 | $ | 39,161.87 |
| DISCIPLINED GROWTH INVESTORS | 12 27 2004 | 100.0000 | 17.86900 | $ | 1,786.90 |
| DISCIPLINED GROWTH INVESTORS | 12 27 2004 | 100.0000 | 17.88400 | $ | 1,788.40 |
| DISCIPLINED GROWTH INVESTORS | 12 27 2004 | 200.0000 | 17.88400 | $ | 3,576.80 |
| DISCIPLINED GROWTH INVESTORS | 12 31 2004 | 300.0000 | 17.99310 | $ | 5,397.93 |

TABLE OF MOVANT DISCIPLINED GROWTH INVESTORS, INC.'S LOSSES IN EPIX SECURITIES

| NAME | BUY DATE | SHARES | PRICE | AMOUNT | |
|------|----------|--------|-------|--------|---|
| DISCIPLINED GROWTH INVESTORS | 12 27 2004 | 100.0000 | 17.88400 | $ | 1,788.40 |
| DISCIPLINED GROWTH INVESTORS | 12 31 2004 | 100.0000 | 17.99310 | $ | 1,799.31 |
| **TOTAL SHARES BOUGHT AND VALUE** | | **122,225.0000** | | **$** | **2,189,719.65** |
| **SHARES HELD AND VALUE (NO SELL TRANSACTIONS)** | 03 21 2005 | 122,225.0000 | 8.77040 | **$** | **1,071,962.14** |
| **MOVANTS' TOTAL LOSS** | 03 21 2005 | | | **$** | **1,117,757.51** |

For shares held at the end of the class period, damages are calculated by multiplying the shares held by the average share price during the 90 calendar days after the end of the Class Period. The price used is $8.7704 as of March 21, 2005.

TABLE OF MOVANT DISCIPLINED GROWTH INVESTORS, INC.'S LOSSES IN EPIX SECURITIES

# EXHIBIT C - INVESTOR MANAGEMENT AGREEMENT

<u>INVESTMENT MANAGEMENT AGREEMENT</u>
(Non-ERISA)

This Agreement is made and entered into this
by and between .                                    ("Client") and Disciplined
Growth Investors, Inc. ("Adviser"), for the purpose of setting forth the terms and conditions by
which Adviser will manage the assets designated for management and shall become effective on
___, 2004 (the "Effective Date").

NOW, THEREFORE, in consideration of the premises, the parties hereto agree as
follows:

1.      <u>Appointment as an Adviser</u>  Client hereby appoints and retains Adviser as
investment adviser to Client on the terms and conditions set forth herein for those assets of Client
from time to time designated in writing by Client (the "Portfolio").  Adviser will assume
responsibility for the investment management of the Portfolio on the Effective Date.

2.      <u>Authority</u>  Adviser shall have full discretionary authority with respect to
the assets of the Portfolio, subject to such limitations as Client may impose by notice in writing
from time to time.  Adviser, as agent and attorney-in-fact with respect to the Portfolio, when it
deems appropriate, without prior consultation with Client, may (a) buy, sell, exchange, convert
and otherwise trade in any stocks, bonds and other securities, including but not limited to money
market instruments, mutual funds, warrants, put and call options to buy or sell stock, bonds and
other securities, and contracts related to same, on margin or otherwise, or engage in any new
investment technique for the acquisition or sale of any of the foregoing securities ("securities"),
for such prices and at such terms as Adviser, in its sole discretion, deems advisable, (b) place
orders for the execution of such securities transactions with or through such brokers, dealers or
issuers as Adviser may select, and (c) act on behalf of Client in all matters whatsoever necessary
or incidental to the serving of the Portfolio and all transactions therein; provided, however, that
Adviser shall not have authority to appropriate or obtain custody of any assets in the Portfolio,
except as otherwise agreed in writing by Client and Adviser.

3.      <u>Services of Adviser</u>  By execution of this Agreement, Adviser accepts the
appointment as investment adviser and agrees to manage and direct the investments of the
Portfolio in accordance with the investment objectives of Client as communicated to Adviser in
writing from time to time.  Client acknowledges that Adviser does not warrant the rate of return
on or market value of the investments of the Portfolio, and agrees that the sole standard of care
imposed upon Adviser by this Agreement is to act with the care, skill, prudence and diligence
under the circumstances then prevailing that a prudent person acting in a like capacity and
familiar with such matters would use in the conduct of an enterprise of a like character and with
like aims.  It is agreed that Adviser, in the maintenance of its records, does not assume
responsibility for the accuracy of information furnished by Client or any other party,

4.    <u>Custodianship</u> Banc of America Securities, LLC, or such other entity or entities as Client shall specify in writing, shall act as custodian for all assets of the Portfolio. To facilitate the management of the Portfolio, Adviser may (a) direct such custodian to hold securities and investments, (b) direct such custodian to hold credit balances in a custodian account at a national bank, together with other funds held by such custodian, (c) make all sales, purchases and exchanges of securities and other investments to, from or through such persons, partnerships and corporations as Adviser may select, and (d) direct such custodian to settle all transactions in the customary manner and in the usual course of business.

Adviser shall quarterly send to Client an itemized statement showing the funds and securities in the Portfolio as of the date of such statement and all debits, credits and transactions in the Portfolio since the date of the last statement. Client shall take whatever action is required to permit Adviser to carry out its discretionary authority as provided in paragraph 2 hereof. Adviser shall not be responsible for any loss incurred by reason of any act or omission of any custodian or any broker or dealer that may be selected by the Adviser to execute transactions for the Portfolio; provided, however, that Adviser will make reasonable efforts to require that any such brokers, dealers and custodians perform their obligations with respect to the Portfolio.

5.    <u>Confidential Relationship</u> All information and advice furnished by either party to the other hereunder, including their respective agents and employees, shall be treated as confidential and shall not be disclosed to third parties except as required by law.

6.    <u>Services to Other Clients</u> It is understood that Adviser performs investment advisory services for various clients. Client agrees that Adviser may give advice and take action with respect to any of its other clients which may differ from advice given or the timing or nature of action taken with respect to the Portfolio, so long as it is the Adviser's policy, to the extent practical, to allocate investment opportunities to the Portfolio over a period of time on a fair and equitable basis relative to other clients. It is understood that Adviser shall not have any obligation to purchase or sell, or to recommend for purchase or sale, for Client's account any security which Adviser, its principals, affiliates or employees may purchase or sell for its or their own accounts or for the account of any other client, if in the opinion of Adviser such transaction or investment appears unsuitable, impractical or undesirable for Client's account.

7.    <u>Allocation of Brokerage</u> When Adviser places orders for the execution of portfolio transactions for the Portfolio, Adviser may allocate such transactions to such brokers and dealers, for execution on such markets, at such prices and at such commission rates as in the good faith judgment of Adviser will be in the best interest of the Portfolio, taking into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities, research and other services provided by such brokers or dealers which are expected to enhance the general portfolio management capabilities of Adviser, and the value of an ongoing relationship of Adviser with such brokers and dealers) without having to demonstrate that such factors are of a direct benefit to the Portfolio.

8.    <u>Inside Information</u>  Adviser shall have no obligation to seek to obtain any material non-public ("inside") information about any issuer of securities, or to purchase or sell, or to recommend for purchase or sale, for the Portfolio the securities of any issuer on the basis of any such information as may come into its possession.

9.    <u>Proxies</u>  Adviser will be responsible for voting all proxies pertaining to the assets of the account unless Client retains proxy voting authority by providing written revocation of Adviser's authority to vote such proxies.  Adviser may, in its sole discretion, consult Client for direction of proxy voting.

10.    <u>Fees</u>  The compensation of Adviser for its services under this Agreement shall be calculated and paid in advance of the calendar quarter in accordance with the attached Fee Schedule, which may be amended from time to time by the Adviser upon thirty (30) days' written notice to Client.  In the event that this Agreement is terminated on any day other than the last day of a calendar quarter, the fees to be paid to Adviser hereunder shall be prorated accordingly.  Any fees not paid within such period shall be paid from the Portfolio.  It is agreed that such fees are paid solely in exchange for the services of Adviser as described in paragraphs 2 and 3 and that brokerage charges, commissions, taxes and other costs incident to the purchase and sale of securities which are included in the cost of securities purchased or charged against the proceeds in the case of sale shall be charged to and paid out of the Portfolio.

11.    <u>Valuation</u>  In computing the market value of any investment of the Portfolio, each security listed on any national securities exchange or the NASDAQ National Market or NASDAQ Small Cap Market shall be valued at the last quoted sale price on the valuation date on the principal exchange or on the NASDAQ market on which such security is traded.  Any other security or assets shall be valued in a manner determined in good faith by Adviser to reflect its fair market value.

12.    <u>Investment Objectives and Restrictions</u>  It will be Client's responsibility to advise Adviser of the investment objectives of the Portfolio and of any changes or modifications therein as well as any specific investment restrictions applicable hereto and to give Adviser prompt written notice if Client deems any investments made for the Account to be in violation of such objectives or restrictions.  Unless Client notifies Adviser in writing of specific restrictions, the investments made on behalf of the Portfolio shall be deemed not to be restricted under the current or future laws of any state or by virtue of the terms of any contract or instrument purporting to bind Client or Adviser.

13.    <u>Representations and Warrants</u>  The execution and delivery of this Agreement by the Client shall constitute the representation by Client that the terms hereof do not violate any obligation by which Client is bound, whether arising by contract, operation of law or otherwise, and if Client is a corporation or trust, that this Agreement and the types of investment contemplated hereby have been duly authorized and when this Agreement is so executed and delivered it will be binding upon Client in accordance with its terms.  Client agrees that it will

deliver to Adviser such evidence of such authority as Adviser may reasonably request, whether by way of certified corporate resolution or otherwise.

14.    Personnel Designations  Client may not designate the employee, officer or associate of Adviser who shall perform the services set forth in this Agreement.

15.    Assignment  No assignment, as that term is defined in the Investment Advisers Act of 1940, as amended from time to time, of this Agreement shall be made by Adviser without the written consent of Client.

16.    Amendment  This Agreement may be amended at any time by written agreement between Adviser and Client.

17.    Termination  This Agreement may be terminated without the payment of any penalty by either party upon thirty (30) days prior written notice to the other party. This Agreement may also be terminated by Client without the payment of any penalty within five business days after the date of this Agreement upon written notice to Adviser. Notice shall be considered given when received by Adviser at the following address:

Suite 2100
100 South Fifth Street
Minneapolis, MN 55402

or when deposited by first class mail postage prepaid, addressed to Client's address as shown on Adviser's books. Such termination shall in no way affect the validity of this Agreement with reference to any transactions, trades, dealings and actions for the Portfolio initiated by Adviser prior to such termination. The Adviser's responsibility for investment management decisions shall cease upon receipt of the written notice of termination or upon remittance by it of such written notice of termination, unless a later date is specified in such notice.

18.    Successors  This Agreement shall inure to the benefit of Adviser and its successors, irrespective of any change at any time in the personnel thereof. This Agreement shall bind Client; Client's estate and any heirs, beneficiaries or successors in interest with respect to all transactions, trades, dealings and actions by Adviser after Client's death, mental incapacity, insolvency, dissolution or liquidation until such time as Client's legal representative notifies Adviser, in the manner set forth herein, of his intention to terminate this Agreement.

19.    Agreement to Arbitrate  This Agreement and its enforcement shall be governed by the laws of the State of Minnesota. Adviser and Client acknowledge that this Agreement is being entered into to facilitate, among other things, Client's ability to buy and sell securities on national exchanges and markets, and that this Agreement therefore involves interstate commerce. Adviser and Client specifically agree and recognize that all controversies which may arise between Adviser, its agents, representatives or employees and Client, concerning any transaction, account or the construction, performance or breach of this or any

CP01:604377_2                                  4

other agreement between Adviser and Client, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration to the fullest extent provided by law. Such arbitration shall be in accordance with the rules then in effect of the American Arbitration Association in Minneapolis, Minnesota. The client understands that it is not obligated to arbitrate disputes under the federal securities laws to the extent such claims are held not to be arbitrable as a matter of law.

     20.       <u>Form ADV</u> Client acknowledges that it has received Part II [and Schedule F] of Advisers Form ADV.

     21.       <u>Non-ERISA</u> Client hereby represents that none of the assets are assets of an employee benefit plan subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA) as amended.

     IN WITNESS WHEREOF, the parties hereof have executed this Agreement the date and year first above written.

# EXHIBIT D - FIRM RESUMÉ

# GLANCY BINKOW & GOLDBERG LLP
## ATTORNEYS AT LAW

NEW YORK OFFICE

1501 BROADWAY SUITE 1900
NEW YORK, NY 10036
TELEPHONE (917) 510-0009
FACSIMILE  (646) 366-0895

1801 AVENUE OF THE STARS, SUITE 311
LOS ANGELES, CALIFORNIA 90067

————

TELEPHONE (310) 201-9150
FACSIMILE (310) 201-9160
info@glancylaw.com

SAN FRANCICSO OFFICE

455 MARKET ST., SUITE 1810
SAN FRANCISCO, CA 94105
TELEPHONE: (415) 972-8160
FACSIMILE:  (415) 972-8166

## EXHIBIT - FIRM RESUME

Glancy Binkow & Goldberg LLP has represented investors and consumers in federal and state courts throughout the United States for over fifteen years.  Based in Los Angeles, California and with offices in New York, New York and San Francisco, California, Glancy Binkow & Goldberg has developed expertise prosecuting securities fraud, antitrust and complex commercial litigation. As Lead Counsel or as a member of Plaintiffs' Counsel Executive Committees, Glancy Binkow & Goldberg has recovered in excess of $1 billion for parties wronged by corporate fraud and malfeasance.  The firm's efforts on behalf of individual investors have been the subject of articles in such publications as The Wall Street Journal, The New York Times and The Los Angeles Times.

Appointed as Lead or Co-Lead Counsel by federal judges throughout the United States, Glancy Binkow & Goldberg has achieved significant recoveries for class members, including:

In re Heritage Bond Litigation, USDC Central District of California Civil Action No. 02-ML-1475-DT, where as co-Lead Counsel, Glancy Binkow & Goldberg has already recovered in excess of $27 million dollars for defrauded investors and continues to pursue additional defendants.

In re ECI Telecom Ltd. Securities Litigation, USDC Eastern Virginia Civil Action No. 01-913-A, in which Glancy Binkow & Goldberg served as sole Lead Counsel and recovered almost $22 million for defrauded ECI investors.

Yaldo v. Airtouch Communications, State of Michigan, Wayne County, Case No. 99-909694-CP in which Glancy Binkow & Goldberg served as co-Lead Counsel and achieved a settlement valued at over $32 million for defrauded consumers.

In re Infonet Services Corporation Securities Litigation, USDC Central California, Case No. CV 01-10456 NM, in which as co-Lead Counsel, Glancy Binkow & Goldberg achieved a settlement of $18 million.

In re Musicmaker.com Securities Litigation, USDC C.Cal. 00-02018, a securities fraud class action in which Glancy Binkow & Goldberg was sole Lead Counsel for the Class and recovered in excess of $13 million.

In re ESC Medical Systems, Ltd. Securities Litigation, USDC Southern New York 98 Civ. 7530, a securities fraud class action in which Glancy Binkow & Goldberg served as sole Lead Counsel for the Class and achieved a settlement valued in excess of $17 million.

In re Lason, Inc. Securities Litigation, USDC Eastern Michigan 99 76079, in which Glancy Binkow & Goldberg was Co-Lead Counsel and recovered almost $13 million for defrauded Lason stockholders.

In re Inso Corp. Securities Litigation, USDC Massachusetts 99 10193, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement valued in excess of $12 million.

In re National TechTeam Securities Litigation USDC Eastern Michigan 97-74587, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement valued in excess of $11 million.

In re Ramp Networks, Inc. Sec. Litig., USDC Northern California, Case No. C-00-3645 JCS, a securities fraud class action in which Glancy Binkow & Goldberg served as Co-Lead Counsel for the Class and achieved a settlement of nearly $7 million.

Glancy Binkow & Goldberg filed the initial landmark antitrust lawsuit against all of the major NASDAQ market makers and served on Plaintiffs' Counsel's Executive Committee in In re Nasdaq Market-Makers Antitrust Litigation, USDC Southern District of New York, 94 C 3996 (RWS), MDL Docket No. 1023, which recovered $900 million for investors in numerous heavily traded Nasdaq issues.

In addition, Glancy Binkow & Goldberg serves as Class Counsel in In Re Real Estate Associates Limited Partnership Litigation, USDC Central California, 98-7035 DDP, in which plaintiffs' Counsel achieved a $184 million jury verdict after a complex six week trial in Los Angeles, California and later settled the case for $83 million.

The firm currently serves as Lead or Co-Lead Counsel in numerous securities fraud and consumer fraud actions throughout the United States, including, among others:

Shah v. Morgan Stanley Co.,
USDC Southern New York Case No. 03 Civ. 8761 (RJH)

Lapin v. Goldman Sachs,
USDC Southern New York Case No. 03-0850-KJD

In re Gilat Satellite Networks, Ltd. Sec. Litig.,
USDC Eastern New York, Case No. 02-1510 CPS

In re Lumenis, Ltd. Sec. Litig.,
USDC Southern New York, Case No.02-CV-1989 DAB

Taft v. Ackermans, (KPNQwest Securities Litigation)
USDC Southern New York, Case No. 02-CV-07951

In re Amdocs Ltd. Sec. Litig.,
USDC Eastern Missouri, Case No. 02CV950 HEA

In re Heritage Bond Litigation,
USDC Central District of California Civil No. 02-ML-1475-DT

Payne v. IT Group, Inc.,
USDC Western Pennsylvania, Case No. 02-1927

Oscar Private Equity Investments v. Holland, (Allegiance Telecom Securities Litigation)
USDC Northern Texas Case No.. 3:-CV-2761-H

Winer Family Trust v. Queen, (Pennexx Securities Litigation)
USDC Eastern Pennsylvania, Case No. 2:03-cv-04318 JP

In re ADC Telecommunications Inc. Securities Litigation,
USDC Minnesota Case No. 03-1194 (JNE/JGL)

Ree v. Procom Technologies, Inc.,
USDC Southern New York, Case No. 02CV7613

Capri v. Comerica, Inc.,
USDC Eastern Michigan, Case No. 02CV60211 MOB

Porter v. Conseco, Inc.,
USDC Southern Indiana, Case No. 02-1332 SEB

In re Livent, Inc. Noteholders Litigation,
USDC Southern New York, Case No. 99 Civ 9425

Tatz v. Nanophase Technologies Corp.,
USDC Northern Illinois, Case No. 01C8440

Plumbing Solutions Inc. v. Plug Power, Inc.,
USDC Eastern New York, Case No. CV 00 5553 (ERK) (RML)

In re Simon Transportation Services, Inc. Securities Litigation,
USDC Utah, Case No. 2:98 CV 0863 K

The firm has also recently acted as Class Counsel in obtaining substantial benefits for shareholders in a number of actions, including:

In re F & M Distributors Securities Litigation,
> Eastern District of Michigan, Civ. No. 95 CV 71778 DT (Executive Committee Member) ($20.25 million dollar settlement)

James F. Schofield v. McNeil Partners, L.P. Securities Litigation,
> Los Angeles Superior Court, Case No. BC 133799

Resources High Equity Securities Litigation,
> Los Angeles Superior Court, Case No. BC 080254

The firm has served and currently serves as Class Counsel in a number of antitrust class actions, including:

In re Nasdaq Market-Makers Antitrust Litigation,
> USDC Southern District of New York, 94 C 3996 (RWS), MDL Docket No. 1023

In re Brand Name Prescription Drug Antitrust Litigation,
> USDC Northern District of Illinois, Eastern Division, Master File No. 94 C 897

Glancy Binkow & Goldberg LLP has been responsible for obtaining favorable appellate opinions which have broken new ground in the class action or securities fields or which have promoted shareholder rights in prosecuting these actions. Glancy Binkow & Goldberg successfully argued the appeals in Silber v. Mabon I, 957 F.2d 697 (9th Cir. 1992) and Silber v. Mabon II, 18 F.3d 1449 (9th Cir. 1994), which are the leading decisions in the Ninth Circuit regarding the rights of opt-outs in class action settlements. In Rothman v. Gregor, 220 F.3d 81, Glancy Binkow & Goldberg won a seminal victory for investors before the Second Circuit Court of Appeals, which adopted a more favorable pleading standard for investors in reversing the District Court's dismissal of the investors' complaint. After this successful appeal, Glancy Binkow & Goldberg then recovered millions of dollars for defrauded investors of the GT Interactive Corporation. The firm recently argued Falkowski v. Imation Corp., 309 F.3d 1123 (9th Cir. 2002), as amended, 320 F.3d 905 (9th Cir. 2003) and favorably obtained the substantial reversal of a lower court's dismissal of a cutting edge, complex class action brought to seek redress for a group of employees whose stock options were improperly forfeited by a giant corporation in the course of its sale of the subsidiary at which they worked. The revived action is currently proceeding in the California state court system.

The firm is also involved in the representation of individual investors in court proceedings throughout the United States and in arbitrations before the American Arbitration Association, National Association of Securities Dealers, New York Stock Exchange, and Pacific Stock Exchange. Mr. Glancy has successfully represented litigants in proceedings against such major securities firms and insurance companies as A.G. Edwards & Sons, Inc., Bear Stearns, Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley, PaineWebber Incorporated, Prudential Insurance Company, Prudential Securities, Inc., and Shearson Lehman Brothers, Inc.

One of firm's unique skills is the use of "group litigation" - the representation of groups of individuals who have been collectively victimized or defrauded by large institutions. This type of litigation brought on behalf of individuals who have been similarly damaged often provides an efficient and effective economic remedy that frequently has advantages over the class action or individual action devices. The firm has successfully achieved results for groups of individuals in cases against major corporations such as Metropolitan Life Insurance Company, Inc., and Occidental Petroleum Corporation.

Glancy Binkow & Goldberg LLP currently consists of the following attorneys:

### THE FIRM'S PARTNERS

**LIONEL Z. GLANCY**, the founding partner of the firm, was born in Windsor, Canada on April 4, 1962. Mr. Glancy earned his undergraduate degree in political science in 1984 and his J.D. in 1986, both from the University of Michigan. He was admitted to practice in California in 1988, and in Nevada and before the U.S. Court of Appeals, Ninth Circuit in 1989. Mr. Glancy was Law Clerk to the Hon. Howard D. McKibben, U.S. District Court, District of Nevada, 1987.

**PETER A. BINKOW**, a partner in Glancy Binkow & Goldberg, was born in Detroit, Michigan on August 16, 1965. Mr. Binkow earned his degree in English Literature from the University of Michigan in 1988 and attended law school at the University of Southern California (J.D., 1994). Mr. Binkow joined the Law Offices of Lionel Z. Glancy upon graduation and became a partner in 2002.

Mr. Binkow has prosecuted lawsuits on behalf of consumers and investors in state and federal courts throughout the United States. He served as Lead or Co-Lead Counsel in many class action cases, including In re National Techteam Securities Litigation ($11 million recovery for investors), In re Credit Acceptance Corporation Securities Litigation ($2.5 million recovery), In re Lason Inc. Securities Litigation ($12.68 million recovery), In re ESC Medical Systems, Ltd. Securities Litigation ($17 million recovery) In re GT Interactive Securities Litigation ($3 million recovery) and many others. Mr. Binkow has prepared and/or argued appeals before the Ninth Circuit, Sixth Circuit and Second Circuit Courts of Appeals.

Mr. Binkow is admitted to practice before the state of California, the United States District Courts for the Central, Northern and Southern Districts of California, the US District Court for the Eastern District of Michigan and the Ninth Circuit Court of Appeals. He is a member of the Los Angeles County Bar Association and the American Bar Association.

**MICHAEL GOLDBERG**, a partner in Glancy Binkow & Goldberg, specializes in federal securities, federal and state antitrust, and consumer fraud class action lawsuits. He has successfully litigated numerous cases which resulted in multi-million dollar recoveries for investors, consumers and businesses.

Mr. Goldberg was born in New York on April 27, 1966. He earned his BA degree in 1989 from Pitzer College - The Claremont Colleges, and his J.D. degree in 1996 from Thomas M. Cooley Law School. After graduation from law school, Mr. Goldberg joined the Law Offices of Lionel Z. Glancy and became a partner of Glancy Binkow & Goldberg in 2003. He was admitted to both the California and Florida bars in 1997 and is admitted to practice in numerous courts.

**ROBIN BRONZAFT HOWALD,** a native of Brooklyn, New York, returned home in 2001 to open the firm's New York City office. Mrs. Howald graduated magna cum laude from Barnard College in 1980, with a B.A. in psychology. In 1983, she received her J.D. from Stanford Law School, where she served as an Articles Editor for the Law Review. In addition to her current focus upon securities fraud and consumer class action matters, during her 20-year career, Mrs. Howald has handled cases in many different practice areas, including commercial disputes, professional malpractice, wrongful termination, bankruptcy, patent and construction matters. As outside counsel for the City of Torrance, California, she also handled a number of civil rights and land use matters, as well as a ground-breaking environmental action concerning Mobil Oil's Torrance refinery. Mrs. Howald has experience in pre-trial and trial procedure and has successfully prosecuted post-trial motions and appeals.

Mrs. Howald is a member of the bar of both California (1983) and New York (1995), and is admitted to practice in all federal judicial districts in California, the Southern and Eastern Districts of New York, and the United States Supreme Court. She co-authored "Potential Tort Liability in Business Takeovers" (California Lawyer, September 1986), was a speaker and contributing author at the Eighth Annual Current Environmental and Natural Resources Issues Seminar at the University of Kentucky College of Law (April 1991), and served as a Judge Pro Tem for the Los Angeles County Small Claims Court (1996-1997). Married in 1985, Mrs. Howald and her husband have two sons. An avid runner, Mrs. Howald has completed six marathons.

**SUSAN G. KUPFER,** the partner resident in the San Francisco office of Glancy Binkow & Goldberg, joined the firm in 2003. She is a native of New York City and received her A.B. degree from Mount Holyoke College in 1969 and her J.D. from Boston University School of Law in 1973. She did graduate work at Harvard Law School and, in 1977, was named Assistant Dean and Director of Clinical Programs at Harvard, supervising and teaching in that program of legal practice and related academic components.

For much of her legal career, she has been a professor of law. She has taught at Hastings College of the Law, Boston University School of Law, Golden Gate University School of Law and Northeastern University School of Law. Since 1991, she has been a lecturer on law at University of California, Berkeley, Boalt Hall, teaching Civil Procedure and Conflict of Laws. Her areas of academic expertise are Civil Procedure, Federal Courts, Conflict of Laws, Constitutional Law, Legal Ethics and Jurisprudence. Her publications include articles on federal civil rights litigation, legal ethics and jurisprudence. She has also taught various aspects of practical legal and ethical training, including trial advocacy, negotiation and legal ethics, to both law students and practicing attorneys.

She previously served as corporate counsel to The Architects Collaborative in Cambridge and San Francisco and was the executive director of the Massachusetts Commission on Judicial Conduct. She returned to the practice of law in San Francisco with Morgenstein & Jubelirer and Berman DeValerio Pease Tabacco Burt & Pucillo before joining the Firm. Her practice is concentrated in antitrust, securities and consumer complex litigation. She has been a member of the lead counsel team which achieved significant settlements in the following cases: *In re Sorbates Antitrust Litigation ($96.5 million settlement), In re Pillar Point Partners Antitrust Litigation ($50 million settlement), In re Critical Path Securities Litigation ($17.5 million settlement), In re New Era of Networks II Securities Litigation ($5 million settlement).*

---

She is a member of the Massachusetts and California State Bars and the United States District Courts for the Northern, Central and Southern districts of California, the District of Massachusetts, the First and Ninth Circuits Courts of Appeal and the U.S. Supreme Court.

### OF COUNSEL

**NEAL A. DUBLINSKY** was born in Flushing, New York on January 15, 1963. He earned his undergraduate from Yeshiva University in 1984, graduating *summa cum laude*, (highest-ranking graduate of his class) and was the recipient of the Dean Isaac Bacon Award for Excellence in the Humanities. Mr. Dublinsky earned his J.D. form New York University School of Law in 1987 where he participated in the Consumer Protection Clinical Program under renowned Professor Anthony G. Amsterdam. Mr. Dublinsky was admitted to the state bar of California in 1988.

**KEVIN F. RUF** was born in Wilmington, Delaware, December 7, 1961. Mr. Ruf graduated from the University of California at Berkeley in 1984 with a B.A. in Economics and earned his J.D. from the University of Michigan in 1987. Mr. Ruf was admitted to the State Bar of California in 1988. Mr. Ruf was an associate at the Los Angeles firm Manatt Phelps and Phillips from 1988 until 1992, where he specialized in commercial litigation. He was "of counsel" to the Los Angeles firm Corbin & Fitzgerald from 1993 until 2001 where he specialized in white collar criminal defense work, including matters related to National Medical Enterprises, Cynergy Film Productions and the Estate of Doris Duke. Mr. Ruf has extensive trial experience, including jury trials, and considers his courtroom skills to be his strongest asset as a litigator. In his spare time, Mr. Ruf is an actor and comic. He is a full member of the world-famous Groundlings Theatre and has appeared in a number of television shows and films, including "Seinfeld," "Friends," "Spin City," and "Curb Your Enthusiasm." Mr. Ruf is a member of the Los Angeles County Bar Association.

**ROBERT A. ZABB**, attended Yale College and Columbia Law School, and received his B.A. in 1975 and his J.D. in 1979. Mr. Zabb is admitted to practice in California, New York and Massachusetts, in state and federal courts in those jurisdictions. His practice has consisted of general business litigation with a specialization in federal securities litigation on the plaintiff and defense sides. He has practiced actively in the U.S. District Courts for the Southern and Eastern Districts of New York, which are important centers for securities litigation. Mr. Zabb's accomplishments are reflected in numerous reported case decisions, particularly in the cases known as SEC v. Thrasher (Southern District of New York) and In re MTC Securities Litigation (Eastern District of New York). Mr. Zabb has had the privilege of arguing a case before the U.S. Supreme Court. This was a securities case delineating the permissible scope of a private right of action, and is known as Employers Insurance of Wausau v. Musick, Peeler and Garrett.

**MARK LABATON** has extensive experience successfully litigating complex, multi-million lawsuits as both a plaintiffs' and a defendants' lawyer. Mark has played the primary role in cases resulting in settlements or judgments in favor of parties he represented of more than $200 million. He has prosecuted corporate governance, securities, whistleblower (Qui Tam), consumer and commercial cases throughout the country, including class and derivative actions. In addition, he has defended Fortune 500 companies, private companies, federal agencies and corporate executives.

Previously, as an Assistant United States Attorney for the Central District of California, Mark investigated and brought numerous high-profile cases in Los Angeles and Orange Counties to successful conclusions. These included white-collar fraud, financial institution fraud, whistleblower (Qui Tam) and other False Claims Act cases involving healthcare, defense contracting, minority and women contracting and other governmental program fraud. Mark received awards and commendations from a United States Attorney General, several United States Attorneys and numerous federal agencies.

Mark is a graduate of Duke University Law School (class of 1988), where he served as a staff member and later editorial board editor of the Duke Law Journal. He received the Hervey M. Johnson Writing Prize for the best law review article. Mark earned a master's degree in journalism from Northwestern University's Medill School of Journalism and a bachelor's degree in history from Oberlin College.

**ROBERT PERKINS** was born May 22, 1955, in Highland Park, Illinois. Mr. Perkins attended the University of Illinois, Champaign, Urbana, graduating in 1979 with a B.S. in Finance (honors). Mr. Perkins thereafter attended law school at the University of Missouri, Columbia, graduating in 1982 (CJS awards - State and Local Taxation; Internship - Missouri Supreme Court, Chief Judge Albert Rendlen). Following law school, Mr. Perkins ran his own law firm, practicing complex litigation, product liability litigation and class action litigation.

**MICHAEL B. ACKERMAN** was born in Brooklyn, New York, June 30, 1962. He received his Bachelor of Arts from Columbia University in 1984 and attended Fordham University Law School (J.D. 1987). Mr. Ackerman was admitted to the New York bar in 1989 and the California bar in 1990. Mr. Ackerman is a member of the American Bar Association, the Los Angeles County Bar Association and the Association of the Bar of the City of New York.

**CLAUDIA J. BUGH** joined Glancy Binkow & Goldberg LLP in 2003. Ms. Bugh is California licensed as both an attorney and a C.P.A. She previously practiced law in South Bend, Indiana after graduating summa cum laude from the Notre Dame Law School in 1994. Before attending law school Ms. Bugh was an auditor with Deloitte and Touche. She has a bachelors degree in business economics from the University of California-Santa Barbara where she graduated in 1988 with the highest honors.

## ASSOCIATES

**DALE MacDIARMID** is a native of Los Angeles, California. He holds a B.A. in Journalism (with Distinction) from the University of Hawaii, and a J.D. from Southwestern University School of Law, where he was member of the Board of Governors of the Interscholastic Trial Advocacy Honors Program. He is admitted to practice in California and before the United States District Courts for the Central and Northern Districts of California. Dale is a member of Kappa Tau Alpha, the national journalism honor society, and before joining Glancy Binkow & Goldberg he was a writer and editor for newspapers and magazines in Honolulu and Los Angeles.

**DANIEL HARGIS** was born in Huntsville, Alabama in 1975. He graduated from UCLA (B.A., 1998), and UCLA School of Law in 2002. He was admitted to the California bar in 2003.

**AVRAHAM (AVI) NOAM WAGNER** joined Glancy Binkow & Goldberg LLP in 2003 after graduating from Georgetown University Law Center. During law school he gained valuable experience prosecuting securities cases while working at the United States Securities and Exchange Commission in Washington, D.C. Mr. Wagner is conversant in both Italian and Hebrew.

# EXHIBIT E - FIRM RESUMÉ

**EXHIBIT E**

# MOULTON & GANS, P.C.

Year Established: 1997
33 Broad Street, Suite 1100
Boston, Massachusetts 02109-4216

Telephone: 617-369-7979
Telecopier: 617-369-7980

*General Civil and Criminal Trial and Appellate Practice in All
State and Federal Courts.  Securities and Business Litigation,
Civil and Criminal Antitrust Litigation.*

## <u>MEMBERS OF FIRM</u>

**STEPHEN MOULTON** (1929 - 2001).

**NANCY FREEMAN GANS**, born Philadelphia, Pennsylvania, November 26, 1943; admitted to bar, 1970, Massachusetts; 1975, U.S. Supreme Court; 1996, U.S. District Court. *Education*: University of Rochester (B.A., with highest honors, 1965); Harvard University (J.D., 1970).  Phi Beta Kappa.  *Member*: Massachusetts Bar Association.

The firm has litigated securities fraud cases resulting in recoveries of over $500 million for aggrieved shareholders, including cases against defendants such as Raytheon Company, PricewaterhouseCoopers LLP, Allaire Corporation, G-Tech Corporation and others.

Areas of Concentration:  Securities Fraud; Antitrust; Class Actions.

Email:  nfgans@aol.com